IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAVID M. OPFERMAN, | ) |
| Plaintiff, | ) 2:24-cv-1709 |
| vs. | ) Magistrate Judge Patricia L. Dodge |
| FRANK J. BISIGNANO, COMMISSIONER OF SOCIAL SECURITY, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION**

Plaintiff David M. Opferman ("Opferman") commenced this action against Frank J. Bisignano, the Commissioner of Social Security ("Commissioner"), pursuant to 42 U.S.C. § 405(g). Opferman seeks judicial review of an unfavorable decision regarding his claims for a period of disability and for social security disability insurance benefits ("DIB"). Plaintiff has moved for summary judgment, and the motion has been fully briefed.

For the reasons set forth below, the Court will grant summary judgment in favor of Opferman, vacate the decision of the Commissioner to deny benefits and remand the matter pursuant to sentence four of § 405(g) to the Commissioner for further review of the issue of balance restrictions as described below.[1]

**I.   Procedural History**

Opferman filed an application for DIB on October 5, 2022. (R. 14, 161-71.)[2] His claim was initially denied on November 29, 2022. It was again denied on reconsideration on May 12, 2023. (R. 52, 67.)

---

[1] The parties have fully consented to jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).
[2] Citations to the record (ECF No. 3) are referred to as "R."

Opferman then took an appeal in which he sought a hearing before an Administrative Law Judge ("ALJ"). A hearing was held on February 6, 2024 before ALJ Christian Bareford (R. 27-51.) ALJ Bareford issued an unfavorable decision on April 25, 2024, finding that Opferman was not disabled under the Social Security Act. (R. 11-26.) Thereafter, Opferman filed a request for review of hearing decision/order to the Appeals Council, and his appeal was denied on November 13, 2024. (R. 1-6.)

Opferman commenced the present action on December 17, 2024 in order to seek judicial review of the denial of benefits. He subsequently filed a motion for summary judgment (ECF No. 9), which has been fully briefed (ECF Nos. 10, 13, 14).[3]

## II. Relevant Factual Background

Opferman alleges that his disability began on September 17, 2021 due to peripheral neuropathy and high blood pressure. (R. 53, 161, 188.)

### A. Hearing Testimony

Opferman testified at the hearing that he stopped working in September 2021 because of pain in his feet, primarily in his heels, and numbness in his lower extremities. (R. 38-39.) He described the sensation in his feet as "constant pins and needles" with numbness and pain. (R. 39.) He claims to be unable to sit or stand for more than about fifteen minutes at a time and must elevate his feet before he is able to resume walking. (R. 39.) He also has trouble picking things up because of numbness and tingling in his fingers. (R. 42.) Opferman testified that at night, he gets shooting pains and both his hands and feet cramp. He also has issues with his balance. (R. 39.)

---

[3] Although the Commissioner did not file a motion for summary judgment, the Supplemental Rules for Social Security indicate that "The action is presented for decision by the parties' briefs." (Supp. Rule 5.)

According to his testimony, Opferman's job entailed about 60% driving. When he drove, he had to pull over about every fifteen minutes to either put his feet up or walk around. (R. 38.) He was involved in two motor vehicle accidents within a month. (*Id.*) He no longer drives more than about a mile and relies on his wife to do the driving. (R. 40.)

Opferman estimated that after he walks about a block, his feet start cramping and they are especially painful when it is cold. (R. 40.) He does not use any assistive device to walk; however, when he moves around in his house, he is "usually using furniture or something to grasp onto" due to balance issues. (R. 41.) He holds onto the shower wall with one hand when showering and fell once in the shower in the past year. (R. 44-45.) He uses a shopping cart as a walker while shopping. (R. 41.)

A vocational expert, Samuel Edelman, also testified at the hearing. (R. 46-52.) When asked to assume the hypothetical restrictions which the ALJ ultimately adopted and included in the residual functional capacity ("RFC"),[4] the expert ruled out Opferman's past job.[5] At the same time, he testified that an individual with Opferman's restrictions would be able to perform jobs with light level duty, including copy machine operator, small parts assembler, and electrical assembler. (R. 47-48.) As he testified:

> So the jobs I've suggested allow the person to sit or stand to perform the work. The only issue in the hypothetical is that the transition time from sitting to standing, if that exceeds more than six minutes per hour, that means that they're off task more than 10%, and they would not be able to do the job. As long as they can perform the job, either seated or standing, and there isn't that time off task in transition, they can perform it.

(R. 49-50.)

---

[4] RFC is the most a claimant can do despite his or her physical and mental limitations. 20 C.F.R. § 404.1545(a)(1).
[5] Mr. Edelman described Opferman's prior jot as "cable television installer, DOT 821.281-010, SVP of 5, requiring heavy exertion." (R. 47.)

3

No other witnesses testified during the hearing.

B. <u>Relevant Medical Evidence</u>

1. <u>CRNP Terling</u>

A number of medical records were submitted as part of the record. Both parties reference records from CRNP Nicole Terling, which include progress notes and assessments as well as a capacity questionnaire prepared for Prudential Insurance on February 14, 2022. (R. 437-43.) Among other things, Terling's records reference both Opferman's neuropathy and balance issues. Her capacity questionnaire states that Opferman is not capable of certain tasks, including climbing ladders, engaging in work with balancing or heights, kneeling and crawling or carrying or lifting up to 50 pounds with both hands. (R. 437.) She concluded that Opferman was not capable of full-time work. (R. 437.) At the same time, when asked about accommodations that would allow him to increase his work capacity, she stated that he could be on desk duty, with frequent breaks and position changes as needed, and should work from home because of an inability to drive. (R. 438.)

In a description of Opferman's impairments, Terling wrote as follows:

> Ongoing symptoms of sensory issues with the bilateral lower extremities. He continues to remain unsafe for driving due to the sensory changes. He would be considered unsafe when not able to feel pressure with the gas and brake pedals. He does have balance issues and has issues with steps. He does have issues with his feet being caught on objects and not being able to recognize this which increases his risk[] factors for falling. He is unable to be exposed to heat or cold due to not being able to sense something hot or cold which increases his risks for burns and frost bite. At this time, he may return to work with a position where he would be on desk duty/light duty otherwise he would need to remain out of work for any position requiring him to drive, stand for prolonged periods of time, exposure to possible hazards to cause him to trip or fall (includes loose carpets, rugs, clutter, weather, liquids, anything where he would have [to] step off of the floor i.e.: ladders, step stools). He will need to be able to take breaks every hour to elevate his legs approximately for 10-15 minutes. **At this time, he is to remain out of work indefinitely unless a position is able to be created to accommodate the information provided above.**

(R. 441.)

2. <u>Dr. Blaum and Dr. Singh</u>

Opferman's initial application for DIB was reviewed by Louis Blaum, M.D., a state agency medical consultant, on November 29, 2022. (R. 53-60.) Dr. Blaum noted that Opferman was started on Cymbalta, and felt improvement of his hypersensitivity to all aspects of his feet. (R. 54.) He noted that Opferman "helps get kids ready for school, independent for personal care, he helps with housework[,] does some household repairs and uses riding mower. He drives short distances, shops in stores and handles finances. He can lift 20-30 [pounds] and can walk about a block." (R. 54.) On sensory examination "there is length dependent decreased sensation to pinprick and temperature to lower 3rd of legs bilaterally." (R. 54.) His gait was "slow but narrow based-no longer wide based. Patient can do tandem walk and walk on tiptoes and heels but with some staggering." (R. 54.)

Dr. Blaum noted that CRNP Terling's opinion was based solely on Opferman's self-reported severity of symptoms. (R. 55.) He noted that Opferman's impairments could reasonably be expected to produce the pain or other symptoms he experienced, but his statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence. Dr. Blaum found these statements about symptoms to be "partially consistent" considering the total medical and non-medical evidence. (R. 55.)

Ultimately, Dr. Blaum concluded that Opferman's description of daily activities being moderately limited was "partially consistent with his reported limitations." (R. 58.) According to Dr. Blaum, Opferman could not climb ladders, ropes or scaffolds and his ability to balance, stoop, kneel, crouch and crawl were all limited to "occasional" because of neuropathy in his lower legs and feet. (R. 56.) Dr. Blaum also noted that Opferman "does have balance issues and has issues with steps." (R. 58.) Further, "he does have issues with his feet being caught on objects and not

being able to recognize this which increases his risk factors for falling." (*Id.*) Dr. Blaum also noted the need for Opferman to remain out of work for any position that would require him to be exposed to possible hazards that would cause him to trip or fall, including loose carpets, rugs, liquids or "clutter." (*Id.*) He recommended that Opferman avoid concentrated exposure to extreme cold, extreme heat and wet areas and avoid all exposure to hazards (machinery, heights, etc.) because of his neuropathy. (R. 57.)

Dr. Blaum concluded that Opferman could stand and/or work with normal breaks for four hours and sit with normal breaks for about six hours in an eight-hour workday. (R. 56.) It was his view that Opferman would be limited to sedentary work and the following occupations had a significant number of jobs in the national economy that he could perform: table worker, addresser and charge-account clerk. (R. 59.)

After Opferman sought reconsideration of the denial of DIB, the record was reviewed by Gurcharan Singh, M.D. in May 9, 2023. Dr. Singh, who is also a state agency medical consultant, affirmed the RFC as determined by Dr. Blaum without any changes. (R. 63-64.)

  4. ALJ's Decision

Of relevance here, after concluding that Opferman met the insured status requirements through December 21, 2026 and had not engaged in substantial gainful activity since September 17, 2021, the ALJ found that Opferman had severe impairments of idiopathic peripheral neuropathy, degenerative disc disease and a balance disorder. He concluded that Opferman did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Among other things, he found that the evidence was insufficient to establish an "extreme limitation in [Opferman's] ability to rise from a seated position or balance while standing as defined by the regulations." (R. 17-18.)

The ALJ also concluded that Opferman had the RFC to perform light duty work with restrictions.[6] He noted that while his impairments had caused some functional impairments, the RFC adequately addressed his symptoms. He stated that he fully accounted for Opferman's neuropathic pain by limiting him to light work with decreased standing and walking with additional postural limitations. Further, the ALJ stated that Opferman's balance problems could be addressed by "limiting exposure to workplace hazards and precluding the operation of a motor vehicle as part of the job." (R. 19.)

In considering the medical evidence, the ALJ noted:

> In making these determinations, the undersigned has fully considered the medical opinions and prior administrative medical findings of record. However, the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources.
>
> Specifically, the undersigned finds the state agency medical consultants to be generally persuasive. Louis Blaum, MD, and Gurcharan Singh, MD, both opined that the claimant would be capable of light work, albeit with decreased standing and walking, with additional postural and environmental restrictions (Ex. 2A at 4-5; 3 at 4). Such a degree of functional limitation is both consistent with and well-supported by the objective evidence showing that the claimant has reported some improvement with conservative treatment modalities.
>
> Conversely, the undersigned finds Nicole Terling, CRNP, to be only somewhat persuasive. Based upon the results of her own treatment records, she opined that the claimant would be capable of light lifting and carrying, with decreased standing and walking, and no exposure to height or hazards (Ex. 5F at 40-41). Again, this is generally supported by the evidence discussed above. However, she also opined that the claimant would be incapable of working on a full-time basis (Ex. 5F at 40). Without further explanation, this is inconsistent with her other conclusions. Additionally, she repeatedly opined that the claimant could not drive or be exposed

---

[6] The noted restrictions were as follows: he could sit for up to six hours and stand and/or walk for up to four hours in an eight-hour workday; he could occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; he could occasionally balance over narrow, slippery or erratically moving surfaces; he could occasionally stoop, kneel, crouch and crawl; he could not work at unprotected heights or in close proximity to dangerous moving mechanical parts; he could not operate a motor vehicle; and he must avoid concentrated exposure to extreme temperatures and wetness.

7

to extreme temperatures (See Ex. 5F at 9, 29, 44, 98; see also Ex. 3F; 5F: 8F). These additional limitations are also supported by the longitudinal treatment records. As discussed above, however, there is no evidence for her conclusion that he would have to take a break every hour in order to elevate his legs for 10 or 15 minutes.

The ALJ determined that although Opferman could not return to his past heavy-duty work as a cable TV installer, there were light duty jobs that exist in significant numbers in the national economy that he could perform, including photocopy machine operator, small parts assembler and electrical accessories assembler. Therefore, the ALJ concluded that Opferman was not disabled from September 21, 2022 through April 25, 2024. (R. 20-22.)

### III.    Standard of Review

"On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citing § 405(g)). As the Supreme Court recently explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.* It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S. Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Id.* at 102-03 (other citations omitted).

The term "disability" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Further:

8

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

To evaluate disability claims, the Commissioner uses a five-step sequential process. The process requires an ALJ to consider: (1) whether the claimant is doing "substantial gainful activity"; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals the listings in the regulations; (4) whether, considering the claimant's RFC and past relevant work, the claimant can still perform past relevant work; and (5) if not, whether considering the claimant's RFC, age, education, and work experience, the claimant can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4). *See Zirnsak v. Colvin*, 777 F.3d 607, 611-12 (3d Cir. 2014) (recounting the five-step process).

The claimant bears the burden of proof at steps one through four, including the determination of RFC, while the ALJ makes the ultimate disability and RFC determinations. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Zirnsak*, 777 F.3d at 611. At the fifth step, the Commissioner bears the burden of demonstrating that the claimant is able to perform work that is available in the national economy. *Bowen*, 482 U.S. at 146 n.5; *Zirnsak*, 777 F.3d at 612. *See* 20 C.F.R. § 404.1560(c)(2) ("we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors.")

IV.  **Analysis**

A.  <u>Failure to Consider and Explain Rejection of Balance Restrictions</u>

In the first issue raised by Opferman, he contends that the ALJ failed to comply with applicable regulations because he failed to "explain his consideration of the factors of supportability and consistency in rejecting the balance limitations assessed by Dr. Blaum and Dr. Singh." (ECF No. 10 at 8.)

"Supportability" is an internal check: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

"Consistency" is an external check: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

In this case, the ALJ found the state agency medical consultants to be "generally persuasive," noting that both opined that Opferman would be capable of light work, with decreased standing and walking, and with additional postural and environmental restrictions. (R. 20.)[7]

Opferman contends that the ALJ did not adopt the balance limitations assessed by Dr. Blaum and Dr. Singh, both of whom limited Opferman's ability to balance as occasional only. Dr. Blaum limited Opferman's his ability to balance as "occasional" because of neuropathy in his lower legs and feet. He noted that Opferman "does have balance issues" and "issues with his feet

---

[7] However, as noted above, Dr. Blaum and Dr. Singh opined that Opferman would be capable of sedentary work, not light work. (R. 59.)

being caught on objects and not being able to recognize this which increases his risk factors for falling." (R. 58.) Dr. Blaum also noted the need for Opferman to remain out of work for any position that would require him to be exposed to possible hazards that would cause him to trip or fall, including loose carpets, rugs, liquids or "clutter." Consistently, CRNP Terling also assessed that Opferman could never engage in balancing and noted his feet getting caught on objects, leading to an increase in his risk factors for falling.

According to Opferman, the ALJ failed to explain why he failed to consider these balance limitations despite having otherwise found the assessments of Drs. Blaum and Singh to be "generally persuasive." Instead, the ALJ's RFC found only that Opferman "can occasionally balance over narrow, slippery, or erratically moving surfaces." (R. 18.) Opferman highlights these differences to be significant.

According to Social Security Ruling ("SSR") 96-9p:

> "balancing" means maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces. **If an individual is limited in balancing only on narrow, slippery, or erratically moving surfaces, this would not, by itself, result in a significant erosion of the unskilled sedentary occupational base. However, if an individual is limited in balancing even when standing or walking on level terrain, there may be a significant erosion of the unskilled sedentary occupational base.** It is important to state in the RFC assessment what is meant by limited balancing in order to determine the remaining occupational base. Consultation with a vocational resource may be appropriate in some cases.

Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work, 1996 WL 374185 (S.S.A. July 2, 1996) (emphasis supplied).

Opferman contends that the ALJ's failure to address the physician's balance assessments was not harmless error. He asserts that since the Commissioner must produce evidence that work exists in significant numbers in the national economy that the claimant can do, the vocational

11

expert must be given proper restrictions in order to determine if such jobs exist.

The ALJ did not explain why he defined "balancing" in this case as "maintaining body equilibrium to prevent falling when walking, standing, crouching, or running on narrow, slippery, or erratically moving surfaces," when the assessment by Dr. Blaum suggested a limitation in balancing even when standing or walking on level terrain. As noted in SSR 96-9p, there is a significant distinction between a limitation in balancing on slippery or narrow surfaces, and a balance limitation when standing or walking on a level terrain. It is important to articulate in the RFC assessment what is meant by limited balancing. Here, the ALJ had three consistent opinions regarding Opferman's balance limitations but failed to address them in the context of his decision. Thus, his assessment of these limitations fails to meet the consistency or supportability factors. The ALJ never explained why these findings would not lead to a conclusion that Opferman has a balancing limitation that could render him disabled.

Moreover, the ALJ asked the vocational expert to assume the individual was capable of light work although Dr. Blaum assessed Opferman as capable of only sedentary work.

As a result, the decision of the Commissioner is not supported by substantial evidence and this matter will be remanded to the Commissioner for further review.

B. <u>Failure to Provide Sufficient Reasons to Reject Subjective Allegations</u>

Opferman also contends that the ALJ erred by failing to provide reasons for rejecting Opferman's subjective statements about being unable to sit or stand for more than fifteen minutes at a time and having to put up his feet because of his peripheral neuropathy. He suggests that the ALJ improperly considered his credibility and his character in his findings.

In 2016, the Commissioner issued SSR 16-3p. In this SSR, the Commissioner indicated that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our

regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character." Specifically, "our adjudicators will not assess an individual's overall character or truthfulness." SSR 16-3p, 2017 WL 5180304, at *11 (S.S.A. Oct. 25, 2017).

Pursuant to SSR 16-3p, when evaluating a claimant's symptoms, the ALJ is required to follow a two-step process to determine whether a medically determinable impairment could reasonably be thought to cause the claimant's alleged symptoms, and then must evaluate the alleged symptoms in light of the entire record. SSR 16-3p, 2017 WL 5180314, at *3-4. The factors an ALJ uses in evaluating the intensity, persistence, and limiting effects of an individual's symptoms are those that are listed in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7. These factors are: (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of pain/symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medications used; (5) other treatment received by claimant for relief of symptoms; (6) any measures claimant takes or has taken to get relief from symptoms (e.g., standing every so often); and (7) other factors related to claimant's functional imitations and restrictions because of their symptoms. 20 C.F.R. § 404.1529(c)(3).

Keeping these factors in mind, SSR 16-3p directs that the ALJ "will discuss the factors pertinent to the evidence of record." SSR 16-3p, 2017 WL 5180304, at *8.

In this case, the ALJ explicitly cited these standards in determining the RFC (R. 18). He then reviewed the following medical evidence:

> Podiatry records show that the claimant has complained of bilateral foot pain, which is worse with ambulation (Ex. 1F at 11; see Ex. 6F at 79). Furthermore, electrodiagnostic testing performed in September of 2021 showed mild to moderate peripheral neuropathy superimposed upon radiculopathy (Ex. 1F at 28-30). As noted above, diagnostic imaging revealed moderately severe foraminal stenosis secondary to degenerative changes in his lumbosacral spine (Ex. 5F at 32-33).

13

> Treatment records from throughout the period at issue consistently note decreased sensitivity in the claimant's feet, which made it unsafe for him to drive (Ex. 1F at 32; 3F at 4; 5F at 7, 9, 66, 70; 7F at 10; 9F at 6). Although he reported some improvement with physical therapy, he continued to complain of problems with his balance (Ex. 5F at 13, 102-132; 8F at 7, 10; see Ex. 6F).
>
> Therefore, the medical evidence shows that the claimant's various impairments have caused certain functional limitations. However, the above stated residual functional capacity adequately addresses the claimant's symptoms. The undersigned fully accounted for the neuropathic pain in the claimant's lower extremities by limiting him to light work with decreased standing and walking, with additional postural restrictions. Furthermore, the undersigned has addressed the claimant's balance problems by limiting eliminating exposure to workplace hazards and precluding the operation of a motor vehicle as a part of the job. The undersigned also identified some environmental conditions that could be hazardous given his diminished sensation.
>
> Moreover, the full longitudinal record does not support finding a greater degree of functional limitation. As discussed above, the claimant reported some overall improvement with physical therapy (Ex. 8F at 10). He also "remains active at home" and exhibited an improved gait (Ex. 7F at 9). The claimant also reported that medication was helpful (Ex. 7F at 9). The most recent neurology records indicate that he "feels much more energetic" and that he was functioning at an adequate level (Ex. 9F at 6). Therefore, after a review of the full longitudinal record, the undersigned finds that the objective medical evidence of record supports the residual functional capacity that has been set forth above.
>
> The undersigned notes that the claimant has also alleged that he has to elevate his legs after sitting for 15 or 20 minutes (See Ex. 5E at 1; 7E at 2, 9). However, there is limited objective evidence showing that he has to elevate his legs throughout the workday, or that he has difficulty with sitting for prolonged periods. Likewise, while the claimant testified that he has trouble using his hands, there is no evidence of any problems with his grip or dexterity (See Ex. 6F at 32; 8F at 36). Thus, the record fails to establish that the claimant would require a more restrictive residual functional capacity than has been adopted herein.

(R. 19-20.)

This detailed discussion fails to support Opferman's contention that the ALJ improperly failed to consider his subjective complaints or considered his character as part of his findings. Rather, the ALJ appropriately applied the standards to evaluate his subjective complaints in light

of the entire record. As confirmed by the applicable regulation, "statements about your pain or other symptoms will not alone establish that you are disabled." 20 C.F.R. § 404.1529(a).[8]

Simply put, a review of the ALJ's decision confirms that he appropriately evaluated Opferman's subjective complaints and did not assess Opferman's credibility or character. Therefore, in this respect, Opferman's motion is without merit.

## V.  Conclusion

For the reasons explained above, the Court will grant summary judgment in favor of Opferman, vacate the decision of the Commissioner to deny benefits and remand the matter pursuant to sentence four of § 405(g) to the Commissioner for further review of the issue of balance restrictions as described above.

An appropriate order follows.

December 11, 2025                                   BY THE COURT:

/s/ Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

---

[8] Notably, the Commissioner's brief cites the *Zirnsak* case (ECF No. 13 at 10), in which the Court of Appeals stated that the ALJ is given discretion in evaluating a claimant's subjective complaints and that "we owe deference to his evaluation of the evidence [and] assessment of the credibility of the witnesses." 777 F.3d at 612. As Opferman observes in his reply brief, *Zirnsak* was decided before the issuance of SSR 16-3p in 2016, which clarified that ALJs are not tasked with evaluating the credibility of claimants. Nonetheless, as discussed above, there is no indication that the ALJ assessed Opferman's credibility as part of his decision.